# Third District Court of Appeal

## State of Florida

Opinion filed July 22, 2015.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D13-3177
Lower Tribunal No. 10-9090

————————————

**Quentin Rashad Wyche,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Miguel De La O, Judge.

Carlos J. Martinez, Public Defender, and Manuel Alvarez, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Michael W. Mervine, Assistant Attorney General, for appellee.

Before WELLS, ROTHENBERG and LAGOA, JJ.

ROTHENBERG, J.

Quentin Rashad Wyche ("the defendant") appeals his conviction and sentence for the second degree murder of Kendall Berry ("Berry") on the campus of Florida International University ("FIU"), where the defendant and Berry were students. The defendant claims that: (1) the trial court committed fundamental error by instructing the jury on both the law on justifiable use of deadly force and stand your ground, and thus, he should be granted a new trial; (2) defense counsel provided ineffective assistance of counsel by failing to move for a judgment of acquittal based on the State's failure to rebut his theory of self-defense; and (3) the State failed to prove the elements of second degree murder, and thus, his conviction should be reduced to manslaughter. We affirm. As will be demonstrated below: (1) the defendant failed to object to the instructions given, and therefore, he must establish fundamental error in order to obtain a new trial on a jury instruction error; (2) the jury instructions given were not error at all, much less fundamental error, and in fact, the defendant benefitted from the instructions given; (3) the State clearly rebutted the defendant's self-defense claim; and (4) there is ample evidence in this record to support the jury's verdict finding the defendant guilty of second degree murder.

### The Evidence

It is undisputed that on the evening of March 25, 2010, the defendant fatally stabbed Berry outside of FIU's recreation center and that the confrontation

between the defendant and Berry was the result of an earlier altercation between the defendant and Berry's girlfriend, Regina Johnson ("Regina"). The altercation between the defendant and Regina occurred after the defendant tried to catch a ride on the campus tram that Regina was driving. When Regina refused to give the defendant a ride on the tram, the defendant became angry and yelled at her, an argument broke out, Regina took a swing at the defendant, and the defendant smashed a cookie in Regina's face. Regina reported the incident to Berry.

That evening, there were several intramural basketball games being played at the recreation center. Many of the players and spectators were current and former FIU football players. After the games had concluded, Berry approached a window of the recreation center and called Antoine Bell ("Bell"), an FIU football player who worked at the recreation center, over to the window. Although Bell could not hear what Berry was saying, based on the earlier altercation between Regina and the defendant, Bell believed Berry wanted to fight the defendant. Bell told the defendant that Berry wanted to fight him, but Bell advised the defendant not to "go out there."

Despite Bell's warning, the defendant, who was himself an intramural basketball player and a former FIU football player, left the recreation center with Bell, Anthony Cooper ("Cooper") (the defendant's best friend), Garrett Cottom ("Cottom"), and Gib Jenkins ("Jenkins").

When the defendant and his friends exited the recreation center, it was dark and there were a lot of people outside because the basketball games had just ended. It is undisputed that when the defendant left the recreation center with his friends, they saw Berry standing at least fifty yards away with a group of young men, some of whom were FIU football players. Thus, many of the people in the approaching group (the defendant, Bell, Cottom, Cooper, and Jenkins) and the people in the group being approached (Berry, Marquis Rolle ("Rolle"), and others) were basketball players and current and former FIU football players.[1]

As the defendant and the defendant's friends approached Berry and his group, Rolle, noticed that the defendant's friend, Cooper, had his hands balled up into fists. As the defendant approached Berry, Berry asked the defendant to tell him what had happened between the defendant and Regina earlier that day. The defendant did not respond, and thereafter, the defendant and Berry squared off to fight. Because Rolle had seen Cooper's clenched fists as the defendant and the defendant's friends approached Berry, and Rolle saw the defendant and Berry preparing to fight each other, he blocked Cooper and told him that if the defendant

---

[1] The defendant's group included the defendant, who was an athlete, former football player, and an intramural basketball player; the defendant's friend Cooper, who was a football player and also played on the intramural basketball team; and Bell, a football player. Berry's group included Berry, who was a football player; Rolle, who was also a football player; and other unidentified students.

and Berry were going to fight each other, no one was going to "jump in." Rolle

testified as follows:

> Q. What happened when the defendant approached the group?
> A. He walked up and, you know, [Berry] was like, you got to show me one, like pretty much trying to talk to him, you know. . . .
> . . . .
> Q. Did it appear to you that it was a friendly encounter or a friendly exchange at that point or did it seem different from that?
> A. Well, I know it wasn't friendly from the jump because [Cooper] had his hands balled up when he walked up.
> Q. So [Cooper] had his hands balled up into fists?
> A. Yeah.
> Q. And what was the defendant doing at the time?
> A. Nothing. Just standing there.
> Q. Did there come a point in time when it appeared Kendall [Berry] and the defendant were going to fight?
> A. Yes, sir.
> Q. How did that come about?
> A. When they started squaring off.
> . . . .
> Q. Sort of like a boxing type stance?
> A. Yes.
> Q. For the record, with your fists balled up in the air?
> A. Yes, sir.
> Q. What happened once they squared up and it appears that they were going to fight?
> A. I approached. I approached [Cooper] and I let him know if something was to go down that it wasn't going to be any jumping in.
> Q. Were you afraid – what was your concern at that point?
> A. My concern was they were going to jump [Berry] you know. And me, by me knowing [Cooper], you know what I am saying, I tried to talk to him, like if you jump in, you know what I am saying, it's going to be a problem.
> Q. Did you ever tell him anything like it will be a one-on-one?
> A. Yes, sir.

During cross-examination, Rolle further explained that he and Berry had gone to the recreation center to watch the basketball game and, after the game, when the defendant, Cooper, and the defendant's friends came out of the recreation center, he believed that the defendant and his friends were going to attack Berry:

> A. We went there to watch basketball, sir.
> Q. Not your intention. [Berry's] intention.
> A. When [Berry] called me from the SEC, he said come to the rec so we can watch TJ play.
> Q. Uh-uh. And when you got there, you managed to cover his back for him, right?
> A. Yes, sir.
> Q. Because you're his good friend?
> A. Yes, sir.
> Q. And it was your impression that he needed his back covered, right, because you saw [the defendant] with a friend of his?
> A. Yes, sir.
> Q. And you just got finished telling us it was your impression, and what you were doing was because you were afraid that [the defendant] and Cooper, his friend, were going to attack [Berry]?
> A. Yes, sir.
> . . . .
> A. The reason why I thought that is because when they were coming towards us, [Cooper's] hands were already balled up.

The "fair fight" between the defendant and Berry, however, never took place. Before either had made a move past the "squaring-off" stage, the defendant turned, ran towards the recreation center, stopped, reached into his book bag, pulled out a pair of scissors, and tried to separate the scissors into two parts. There was conflicting evidence as to what happened next, but the evidence reflects that when the defendant ran towards the recreation center, Berry chased him, and

6

Cooper and Rolle ran after the defendant and Berry. However, by the time the defendant had pulled the scissors from his book bag, several other "mini-fights" had broken out, including a fight between Cooper and Rolle, and no one was actually near the defendant and Berry when the defendant stabbed Berry with the scissors.

The only person who actually witnessed the stabbing was Chindinma Orji, a student at FIU who did not know either the defendant or Berry. Ms. Orji testified that, as she was leaving the recreation center after the basketball games, she saw approximately ten to twelve young men run past her and then stop, break off into separate groups, and begin fighting each other. When she saw Berry, he was not involved in any of the fights, but she noticed him because he was the only one there with a woman. She also noticed another young man, whom she described as having very long dreadlocks and whom she identified in the courtroom as the defendant, approach Berry. The defendant then took off his book bag, opened it up, removed a pair of scissors, tried to separate the blades, and then lunged at Berry. Although Ms. Orji saw the defendant lunge towards Berry with the scissors, she did not actually see the scissors pierce Berry's body, but she did see Berry fall to the ground immediately following the defendant's lunging motion. Ms. Orji was standing only a few feet away from the defendant when she saw him lunge at Berry with the scissors.

Ms. Orji testified that after the defendant stabbed Berry with the scissors, people began to gather to see what had happened, and the defendant was screaming, saying things like, "[O]h, you better get your boy, you better get your boy, if I didn't already get him, I'm going to get him." It was at that point that Ms. Orji realized Berry was bleeding. Ms. Orji testified that at no time did she see Berry punch or strike the defendant, and everyone agrees that Berry was unarmed.

Kristin Wilson, another disinterested witness, testified that as she was leaving the recreation center she saw several "little fights going on in different areas." She then saw Berry fall to the ground, a girl standing over Berry, and the defendant with a pair of scissors in his hand pacing back and forth threatening Berry and saying if Berry wasn't dead he was going to kill him.

The defendant, who fled the scene, was ultimately arrested and charged with second degree murder. His defense at trial was that he stabbed Berry in self-defense. The defendant was tried and convicted by a jury of second degree murder. The issues he has raised on appeal are addressed below.

## Analysis

### A. Whether the jury instructions given constitute fundamental error

The defendant contends that he is entitled to a new trial because the trial court gave conflicting jury instructions regarding his duty to retreat before resorting to the use of deadly force, thereby negating his theory of self-defense.

8

Before addressing the propriety of the instructions given, we note that, not only did the defendant's trial counsel fail to object to the instructions, the record reflects that during the charge conference defense counsel actively participated in the drafting of this specific instruction and affirmatively agreed to the specific wording of this instruction. The defendant must therefore establish that fundamental error occurred. See Garzon v. State, 980 So. 2d 1038, 1042 (Fla. 2008).

In Ray v. State, 403 So. 2d 956 (Fla. 1981), the Florida Supreme Court cautioned appellate courts to exercise their discretion concerning fundamental error "'very guardedly,'" id. at 960 (quoting Sanford v. Rubin, 237 So. 2d 134, 137 (Fla. 1970), and "only in the rare cases where jurisdictional error appears or where the interests of justice present a compelling demand for its application." id. The Ray court further explained that "[t]he failure to object is a strong indication that, at the time and under the circumstances, the defendant did not regard the alleged fundamental error as harmful or prejudicial," id., and "'where the trial judge has extended counsel an opportunity to cure any error, and counsel fails to take advantage of the opportunity, such error, if any, was invited and will not warrant reversal,'" id. (quoting Sullivan v. State, 303 So. 2d 632, 635 (Fla. 1974), cert. denied, 428 U.S. 911 (1976)); see also Joyner v. State, 41 So. 3d 306, 307 (Fla. 1st DCA 2010) ("[W]here defense counsel agrees to a standard jury instruction and then challenges the conviction based upon fundamental error in that instruction,

9

reversal would have the unintended consequence of encouraging defense counsel to 'stand mute and if necessary, agree to an erroneous instruction' or sacrifice his client's opportunity for a second trial." (quoting Colloway v. State, 37 So. 3d 891, 897 (Fla. 1st DCA 2010))).

"Where [a] challenged jury instruction involves an affirmative defense, as opposed to an element of the crime, fundamental error only occurs where a jury instruction is 'so flawed as to deprive defendants claiming the defense . . . of a fair trial.'" Martinez v. State, 981 So. 2d 449, 455 (Fla. 2008) (second alteration in original) (quoting Smith v. State, 521 So. 2d 106, 108 (Fla. 1988)). As will be demonstrated below, the complained-of instructions did not create a conflict; were not error, much less fundamental error; and in fact, inured to the benefit of the defendant who was seeking an acquittal based on justifiable use of deadly force.

The justifiable use of deadly force instruction given by the trial court is standard jury instruction 3.6(f), which incorporates, in relevant part, sections 776.012, 776.013, and 776.041 of the Florida Statutes. Section 776.012 is titled "Use of force in defense of person" and discusses general standards for self-defense. Section 776.013 discusses circumstances when a person has no duty to retreat, and includes subsection (3), the stand your ground provision. Section 776.041 is titled "Use of force by aggressor," and it is the limiting statute when deadly force may be used by the initial aggressor.

Chapter 776 begins with section 776.012, the statute that addresses when the use of force is legally permissible. Section 776.012 provides as follows:

> A person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. However, a person is justified in the use of deadly force and does not have a duty to retreat if:
> (1) He or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony; or
> (2) Under those circumstances permitted pursuant to s. 776.013.

§ 776.012, Fla. Stat. (2010).[2]

---

[2] The Florida Legislature passed a new version of §776.012 effective June 20, 2014, that clarifies that a person has no duty to retreat when using either deadly or non-deadly force. The 2010 version, of course, drives our analysis, but the new version provides:

> (1) A person is justified in using or threatening to use force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. A person who uses or threatens to use force in accordance with this subsection does not have a duty to retreat before using or threatening to use such force.
> (2) A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony. A person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be.

§ 776.012, Fla. Stat. (2015).

The circumstances provided in section 776.013 initially address when the force is used against someone who unlawfully and forcibly enters a dwelling (subsections (1) and (2)). Subsection (3), however, addresses the situation where the person attacked is in a place other than a dwelling, and it provides as follows:

> A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.

§ 776.013(3), Fla. Stat. (2010).

Section 776.032 provides immunity from criminal prosecution and civil action for the justifiable use of force as permitted in sections 776.012, 776.013, and 776.031 (where the use of force is in defense of another).

Section 776.041 explains that the protections provided in the preceding sections are not available to a person who:

> (1) Is attempting to commit, committing, or escaping after the commission of, a forcible felony; or
> (2) Initially provokes the use of force against himself or herself, unless:
> (a) Such force is so great that the person reasonably believes that he or she is in imminent danger of death or great bodily harm and that he or she has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or
> (b) In good faith, the person withdraws from physical contact with the assailant and indicates clearly to the assailant that he or she

12

desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force.

§ 776.041, Fla. Stat. (2010).

Thus, Chapter 776 addresses both stand your ground and justifiable use of deadly force, and, whether applying stand your ground or justifiable use of deadly force law, the requirements are nearly identical. Under both, a person is justified in the use of deadly force and has no duty to retreat if: (1) he is in a place where he has the right to be; (2) he reasonably believes such force is necessary to prevent death or great bodily harm or the imminent commission of a forcible felony; (3) he did not initially provoke the use of force against himself (he was not the initial aggressor); and (4) he was not himself attempting to commit, committing, or escaping after the commission of a forcible felony. If, however, a person is engaged in unlawful conduct or has initially provoked the use of force against himself, that person has the duty to retreat and/or withdraw from physical contact with the assailant and also clearly indicate that he wishes to withdraw and terminate the use of force before he may rely on the defenses contained in Chapter 776. See § 776.041.

The jury instruction agreed to by the defendant and given by the trial court on this point, Standard Jury Instruction 3.6(f), is a compilation of the statutes contained in Chapter 776 as explained above. Jury Instruction 3.6(f) is an accurate statement of the law on the use of deadly force, and there is no conflict between

13

any of the sections contained in Chapter 776 or any conflict within Jury Instruction 3.6(f).

The instruction provided by the trial court to the jury is as follows:

An issue in this case is whether the defendant acted in self-defense. It is a defense to the offense for which Quentin Wyche is charged if the death of Kendall Berry resulted from the justifiable use of deadly force.

Deadly force means force likely to cause death or great bodily harm.

A person is justified in using deadly force if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another.

However, the use of deadly force is not justifiable if you find:

Quentin Wyche initially provoked the use of force against him, unless:

A. The force asserted towards Quentin Wyche was so great that he reasonably believed he was in imminent danger of death or great bodily harm and had exhausted every reasonable means to escape the danger other than using deadly force on Kendall Berry.

B. In good faith, Quentin Wyche withdrew from physical contact with Kendall Berry and clearly indicated to Kendall Berry that he wanted to withdraw and stop the use of deadly force, but Kendall Berry continued or resumed the use of force.

In deciding whether the defendant was justified in the use of deadly force, you must judge him by the circumstances in which he was surround[ed] at the time the force was used. The danger facing the defendant need not have been actual. However, to justify the use of deadly force, the appearance of danger must have been so real that a reasonabl[y] cautious and prudent person under the circumstance – same circumstances would have believed that the danger could have been avoided only through the use of force. Based upon appearance, the defendant must have actually believed that the danger was real.

If the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat and had the right to stand his ground and meet force with force, including deadly force if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself.

14

If you find that the defendant who because of threats or prior difficulties with Kendall Berry had reasonable ground to believe that he was in danger of death or great bodily harm at the hand of Kendall Berry, then the defendant had the right to arm himself. However, the defendant cannot justify the use of deadly force if, after arming himself he renewed his difficulty with Kendall Berry when he could have avoided the difficulty, although, as previously explained, if the defendant was not engaged in unlawful activity and was attacked in any place where he had the right to be, he had no duty to retreat.

In considering the issue of self-defense, you may take into account the relative physical abilities and capacities of Quentin Wyche and Kendall Berry.

If in your consideration of the issue of self-defense you have a reasonable doubt on the question of whether the defendant was justified in the use of deadly force, you should find the defendant not guilty.

However, if from the evidence you are convinced that the defendant was not justified in the use of deadly force, you should find him guilty if all the elements of the charge have been proved.

Thus, the jury was correctly instructed that the defendant was justified in using deadly force if he reasonably believed such force was necessary to prevent imminent death or great bodily harm and that if he was attacked in a place where he had the right to be and was not engaged in any unlawful activity, he had no duty to retreat. However, as the jury was instructed, if the defendant initially provoked the use of force against him (i.e., he was the initial aggressor), he had the duty to "exhaust[] every reasonable means to escape the danger other than using deadly force," or to "with[draw] from physical contact with Kendall Berry and clearly indicate[] to Kendall Berry that he wanted to withdraw and stop the use of deadly force, but Kendall Berry continued or resumed the use of force."

15

The defendant relies on the First District Court of Appeal's opinion in Floyd v. State, 151 So. 3d 452 (Fla. 1st DCA 2014), review granted, No. SC14-2162 (Fla. Dec. 16, 2014), for the proposition that the instruction given in the instant case was fundamentally flawed. The justifiable use of deadly force instruction given in Floyd, however, differs from the justifiable use of deadly force instruction given in the instant case. Because the Floyd instruction differs from the instruction given in the instant case, our analysis addresses only the instruction given in the instant case.

In the instant case, there was competent substantial evidence presented wherein the jury could have concluded that the defendant was the initial aggressor. It is undisputed that when the defendant exited the recreation center he was not confronted by Berry or anyone else. Rather, the evidence shows it was the defendant and his friends—Cooper, Bell, Cottom, and Jenkins—who confronted Berry, who was standing approximately fifty yards from the recreation center. And as Cooper approached with the defendant, Cooper had his hands balled up into fists, ready to fight. Rolle testified that it appeared to him that the defendant and his friends meant to attack Berry. Because there was evidence upon which the jury could have concluded that the defendant was the initial aggressor, the trial court correctly instructed the jury that if the defendant initially provoked the use of

16

force, he had the duty to retreat or clearly indicate to Berry that he wanted to withdraw and stop the use of force.

The trial court further explained to the jury that even if it found that the defendant had initially provoked the use of force against himself, if the defendant retreated or clearly indicated that he wanted to withdraw from the conflict and Berry continued or resumed the use of force, the jury could still find that the defendant's use of deadly force was legally justified if it found that the defendant reasonably believed he was in imminent danger of death or great bodily harm and had exhausted every reasonable means to escape the danger other than resorting to the use of deadly force.

Thus, the jury was properly asked to decide the following:

1. Did the defendant reasonably believe the force he used was necessary to prevent imminent death or great bodily harm to himself? If so, he was justified in using deadly force and had no duty to retreat unless he initially provoked the use of force against himself.

2. Did the defendant initially provoke the use of force against himself?

3. If the defendant initially provoked the use of force against himself, did he exhaust every reasonable means to escape the danger other than using deadly force? (retreat, withdraw from the conflict?)

4. If the defendant retreated or withdrew from the conflict, did Berry continue or resume the use of force?

5. If Berry continued or resumed the use of force, was the defendant's use of deadly force reasonable under the circumstances?

While we agree that the standard jury instruction on justifiable use of deadly force used by the trial court and the parties could have been constructed with greater clarity to make the various provisions easier to apply, it was legally correct and not internally inconsistent. Thus, no error, much less fundamental error, occurred.

## B.  <u>Whether the State rebutted the defendant's theory of self-defense</u>

The defendant claims that his trial counsel provided ineffective assistance of counsel by failing to move for a judgment of acquittal based on the State's failure to rebut his theory of self-defense. Defense counsel, however, cannot be faulted for failing to raise a meritless issue. <u>Deparvine v. State</u>, 146 So. 3d 1071, 1097 (Fla. 2014).

Although the evidence was susceptible to differing views, the State introduced evidence upon which the jury could have concluded that the defendant initially provoked the use of force against himself; he did not exhaust every reasonable means to escape the danger other than resorting to the use of deadly

18

force; and his use of deadly force was not reasonable under the totality of the circumstances. There was evidence upon which the jury could have found that it was the defendant who confronted Berry with four other athletes, and it appeared that the defendant and his friends were going to attack Berry. When Rolle blocked Cooper and made it clear that if there was going to be a fight, it was going to be between the defendant and Berry, one-on-one, the defendant turned and ran back towards the recreation center. However, when the defendant reached the recreation center, he stopped near the door of the recreation center and armed himself with a deadly weapon. And, based on the evidence presented, the jury could have found the State's argument persuasive—that the defendant was not retreating, but merely repositioning to give himself the opportunity to arm himself. The jury could therefore have concluded that, rather than "exhausting every reasonable means to escape the danger" by simply running into the recreation center, the defendant stopped, withdrew a pair of scissors from his book bag, tried to pull the blades apart, and, when Berry got close enough, the defendant lunged at and fatally stabbed Berry with the scissors.

Because the State offered competent substantial evidence that rebutted the defendant's theory of justifiable use of deadly force, the defendant has not satisfied his burden under Strickland v. Washington, 466 U.S. 668, 687 (1984) (requiring the defendant to demonstrate that counsel's performance was deficient and that

19

counsel's deficient performance prejudiced the defendant, thus depriving the defendant of a fair trial). Prejudice under <u>Strickland</u> is established only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

## C. **Whether the State proved the elements of second degree murder**

Second degree murder is defined as follows:

The unlawful killing of a human being, when perpetrated by an act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual . . . .

§ 782.04 (2), Fla. Stat. (2010). An act or series of acts is imminently dangerous to another and evincing a depraved mind regardless of human life if:

1. a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
2. is done from ill will, hatred, spite or an evil intent, and
3. is of such a nature that the act itself indicates an indifference to human life.

Fla. Std. Jury Instr. (Crim.) 7.4

As previously noted, rather than settling his dispute with Berry by explaining what had happened earlier that day between the defendant and Berry's girlfriend, the defendant confronted Berry with four other athletes and squared off to fight. However, when it became clear that if any fighting was going to take place, it was not going to be a group brawl, the defendant armed himself with a

20

deadly weapon and stabbed Berry in the chest. After stabbing Berry, several witnesses observed the defendant pacing back and forth and ranting that he was going to kill Berry. Specifically, the defendant said, "If I didn't already get [Berry], I'm going to get him," and "if [Berry] wasn't dead . . . [I am] going to kill him." The defendant's actions, coupled with his own words, clearly satisfied the elements of second degree murder, specifically that the defendant acted from ill will, hatred, spite, and an evil intent. Thus, there is no error.

Affirmed.

WELLS and LAGOA, JJ., concur.

Quentin Rashad Wyche v. The State of Florida,<br>3D13-3177

WELLS, Judge, (specially concurring).

I concur in the majority opinion affirming Wyche's conviction below; however, I write separately to address concern over the confusing nature of Standard Jury Instruction 3.6(f), and while I agree that no fundamental error has been demonstrated here, I agree with our sister court that this instruction is problematic. See Floyd v. State, 151 So. 3d 452, 454 (Fla. 1st DCA 2014) (holding that that portion of 3.6(f) which imposes no duty to retreat on an

21

individual not engaged in unlawful activity who is in a place where he or she has a right to be conflicts with the aggressor portion of this instruction which imposes a duty to retreat on a person who initially provokes the use of force against himself or herself) <u>rev. granted by</u>, 2014 WL 7251662 (Fla. Dec. 16, 2014).[3]

As the majority correctly states, the instruction given in this case properly encompasses the statutes governing the use of force in defense of person (section 776.012), circumstances in which there is no duty to retreat (sections 776.012 and 776.013), and use of force by an aggressor (section 776.041). The concerning issue is not the accuracy of the instruction, that is, it is not whether the instruction accurately reflects the law on self-defense and use of deadly force, but rather the confusing manner in which instruction 3.6(f) requires these laws to be presented to the jury.

Rather than first setting forth the general rule of no duty to retreat and then setting forth the applicable exceptions, instruction 3.6(f) does exactly the opposite, first setting forth the exception to the rule—the aggressor instruction—then

---

[3] According to the State, it has certified the following question of great public importance to the Florida Supreme Court:

> When there is a factual dispute, as to who was the initial aggressor, is it fundamental error to give both the standard jury instructions which provide there is no duty to retreat when not engaged in an unlawful activity and the standard instructions which provide there may be a duty to retreat if the defendant initially provoked the use of deadly force? And, if so, what instructions should be given?

22

explaining the general rule.[4]  Thus, while I cannot agree with <u>Floyd</u> in finding that the subject instruction is internally inconsistent, I nevertheless agree that this instruction is confusing when presented to the jury as suggested by instruction 3.6(f).

As the Florida Supreme Court in <u>Perriman v. State</u>, 731 So. 2d 1243, 1246 (Fla. 1999), points out, jury instructions "were designed above all to be accurate and clear" with the purpose of "eliminate[ing]-or minimiz[ing]-juror confusion concerning the applicable law in criminal cases."  For this reason, I reject the determination made in <u>Farmer v. State</u>, 975 So. 2d 1275 (Fla. 4th DCA 2008), that although the language of a 3.6(f) charge may be "'technical, legalistic, utterly opaque . . . [and] almost useless as a way to communicate to juries . . . [because] the medium contain[s] no message,'" giving such a charge in large part is harmless because "instead of trying to parse the legal nuances of the charge . . . juries use their common experience and apply a street version of self defense that allows a defendant to use a reasonable amount of force under the circumstances, and no more."[5]  <u>Farmer</u>, 975 So. 2d at 1277 (quoting Lawrence M. Friedman, A History of

---

[4] Standard Jury Instruction 3.6(f) provides that certain instructions should be read in all cases and that other instructions should be given only if applicable.  In the proceedings below, the instructions were read to the jury in the order that they appear in instruction 3.6(f).  Therefore, as the instruction as quoted in the majority opinion confirms the aggressor instruction was given immediately after the definition of "deadly force" because another instruction appearing before it was inapplicable to the facts of this case.

American Law 399 (2d ed. 1985) (quoted in John L. Kane, <u>Giving Trials a Second Look</u>, 80 Denv. U.L.Rev. 738, 739 (2003))).  As fetching a notion as it might be to accept a jury's reliance on common sense in lieu of parsing and relying on the law as instructed, I find myself constrained to reject it.

An instruction which accomplishes none of the goals and purposes acknowledged in <u>Perriman</u> but which instead provides a constant source of confusion cannot be minimized or disregarded on an assumption that juries will ignore the confusion and simply use common sense.  Were this the goal, there would be no point in instructing juries in the first instance, but rather it simply would be left to the lawyers to argue the facts and the law and then to charge the jurors to "use their common sense." [6]

There is no reason why this instruction cannot be clarified thereby lessening confusion inherent in its current organization, and perhaps resolving any internal contradiction suggested by <u>Floyd</u>.  This might be achieved in this case simply by

---

[5] The offending instruction in that case was the forcible felony portion of a 3.6(f) charge.

[6] <u>See</u> <u>Murray v. State</u>, 937 So. 2d 277, 280 (Fla. 4th DCA 2006) ("Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the [law]. . . . When . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." (quoting <u>Griffin v. United States</u>, 502 U.S. 46, 59–60 (1991))).

the following reorganization of the applicable provisions of instruction 3.6(f) that

were given below:

**(General Rule)**

An issue in this case is whether the defendant acted in self-defense. It is a defense to the offense for which (defendant) is charged if the [death of] . . . (victim) resulted from the justifiable use of deadly force.

"Deadly force" means force likely to cause death or great bodily harm.

A person is justified in using deadly force if [he] [she] reasonably believes that such force is necessary to prevent imminent death or great bodily harm to [himself] [herself] or another . . . .

If the defendant [was not engaged in unlawful activity and] was attacked in any place where [he] [she] had a right to be, [he] [she] had no duty to retreat and had the right to stand [his] [her] ground and meet force with force, including deadly force, if [he] [she] reasonably believed that it was necessary to do so to prevent death or great bodily harm to [himself] [herself] [another] . . . .

In deciding whether the defendant was justified in the use of deadly force, you must judge [him] [her] by the circumstances in which [he] [she] was surrounded at the time the force was used. The danger facing the defendant need not have been actual; however, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could have been avoided only through the use of that force. Based upon appearance, the defendant must have actually believed that the danger was real.

In considering the issue of self-defense, you may take into account the relative physical abilities and capacities of the defendant and (victim).

## (Exceptions to the General Rule of No Duty to Retreat if Applicable to the Facts)

However, the use of deadly force is not justifiable if you find:

(Defendant) initially provoked the use of force against [himself] [herself], unless:

A.  The force asserted toward the defendant was so great that [he] [she] reasonably believed that [he] [she] was in imminent danger of death or great bodily harm and had exhausted every reasonable means to escape the danger, other than using deadly force on (assailant).

B. In good faith, the defendant withdrew from physical contact with (assailant) and clearly indicated to (assailant) that [he] [she] wanted to withdraw and stop the use of deadly force, but (assailant) continued or resumed the use of force.

If you find that the defendant who because of threats or prior difficulties with (victim) had reasonable ground to believe that [he] [she] was in danger of death or great bodily harm at the hands of (victim), then the defendant had the right to arm [himself] [herself]. However, the defendant cannot justify the use of deadly force if, after arming [himself] [herself] [he] [she] renewed [his] [her] difficulty with (victim) when [he] [she] could have avoided the difficulty[.]

## (Concluding)

If in your consideration of the issue of self-defense you have a reasonable doubt on the question of whether the defendant was justified in the use of deadly force, you should find the defendant not guilty.

However, if from the evidence you are convinced that the defendant was not justified in the use of deadly force, you should find [him] [her] guilty if all the elements of the charge have been proved.

To my way of thinking, this instruction would more clearly advise the jury that no duty to retreat arises **unless** the defendant either initially provoked the force being used against him or her, or after lawfully arming himself or herself the defendant is the one responsible for renewing the difficulty with the victim.

As I see it, while not grounds for reversal in this case, Standard Jury Instruction in Criminal Cases 3.6(f) is a repetitive, confusing morass.

ROTHENBERG and LAGOA, JJ., concur.